| | |
|---|---|
| **MICHAEL NETTIE, on behalf of itself and all others similarly situated,** | **CASE NO. 06-0236-CV-W-REL** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **H&R BLOCK, INC., and MARK A. ERNST** | |
| **Defendants.** | |

Plaintiff Michael Nettie, by his undersigned attorneys, alleges, upon information and belief (said information and belief being based, in part, upon the investigation conducted by and through its counsel), except with respect to paragraph 19, which is alleged upon personal knowledge, that defendants H&R Block, Inc. ("HRB" or the "Company") and Mark A. Ernst engaged in a fraudulent course of business conduct between the period of January 31, 2005 through March 14, 2006 inclusive (the "Class Period"), and as follows:

## NATURE OF THE ACTION

1.        HRB is a beleaguered company.  Poor corporate governance, patent refusal to employ adequate internal controls, and both reckless and intentional disregard for the law has incurred the wrath of State Attorneys' General, stockholders and customers alike.  This conduct has financially harmed stockholders as they witnessed the value of their shares fall during the Class Period to record lows.

2.        In particular, in February 2005, California Attorney General Bill Lockyer sued the Company over its highly publicized referral anticipation loans, ("RALs") seeking "hundreds of millions of dollars" on behalf of customers and $20 million in civil penalties.

3.     The California Attorney General's action joins a long list of lawsuits that have targeted HRB's "refund anticipation loans" -- cash advances that the Company arranges for customers so they won't have to wait an extra one to four weeks for a check from the federal government they are otherwise entitled to receive.  In return for the loans, customers must agree to give a percentage of their tax refunds to HRB and its banking partners.  More than 1.5 million Californians have received tax refund loans through HRB offices since 2001, the suit alleged.

4.     Importantly, the loans are a major moneymaker for HRB. In its last fiscal year ending April 2005, HRB recognized a pretax profit of $101.3 million on revenue of $182.8 million generated from the loans nationwide, according to the Company's annual report, as discussed below.

5.     In December 2005, the Company paid $62.5 million to settle class-action suits pending in several jurisdictions alleging the Company charged "usurious" interest rates on loans secured by anticipated tax refunds.

6.     In February 2006, in one of the most ironic developments imaginable, HRB, a Company that specializes in tax-related services, reported that it missed fiscal third-quarter EPS estimates, low-end guidance, and reported it would be restating prior-period earnings due to errors in calculating its own income tax rates.

7.     Finally, on March 15, 2006, New York Attorney General Elliot Spitzer sued HRB alleging that the Company over the last four years opened more than 500,000 "Express IRA" accounts, an individual retirement account ("IRA") that can take the form of either a Traditional IRA or a Roth IRA, for clients of its tax-preparation service; but 85% of the customers who opened the accounts paid the Company fees in excess of what they earned in interest.  According to Mr. Spitzer's complaint, the program exploited lower income, working

families who were led to believe the plan presented an excellent opportunity to save for retirement.

8.     Mr. Spitzer's complaint further avers that Mr. Ernst, the Company's Chief Executive Officer, ("CEO") was aware of the improper fee practices along with other high-ranking members of management.

9.     Revelations concerning the Company's illegal practices concerning the fraudulent Express IRA scheme hammered the Company's stock.  By late afternoon trading on March 15, 2006, the Company's price per share was down 5.5% at $20.28; earlier, shares traded as low as $19.80 per share, passing the previous 52-week low of $21.58 set on March 16, 2006.

10.     The Company's use of these improper practices served to artificially inflate the Company's reported earnings during the Class Period because the Company's earnings were generated through an illegal and unsustainable business practice.  Accordingly, the Company's Class Period statements concerning its compliance with applicable laws and regulations were false.  Also, the Company, having disclosed the existence of - and touted the success of - the Express IRA plan and the RALs program, was obligated to disclose the risks associated with the business, including that members of management, e.g., Mr. Ernst, were aware that these plans (or at least how they were implemented) violated applicable laws.  Failure to disclose this information constituted material omissions, the ultimate disclosure of which harmed the Company's stockholders.

11.     Further, the Company reported inflated earnings during the Class Period.  As reported on or about February 23, 2006, the Company must restate results for fiscal 2004 and 2005, plus previous 2006 quarters, because of errors in calculations regarding its state effective

income tax rate. Reportedly, the errors resulted in the Company understating state income tax liabilities by at least $32 million as of the end of April 2005.

12.     In particular, the self-described leading authority on personal income tax preparation *underestimated* its state income tax liability by approximately $32 million; that would hit earnings by a total of $0.09 a share -- $0.07 in 2005 and $0.02 in 2004. However, since the Company reportedly was still reviewing its control mechanisms, these were only preliminary figures that could very well change.

<u>JURISDICTION AND VENUE</u>

13.     (a)     The claims alleged herein arise under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. Section 78(i)(b), 78(t) and 78t-1(a) and pendent common law claims.

(b)     Jurisdiction over the subject matter of this action is conferred upon this Court by Section 27 of the Exchange Act, 15 U.S.C. Section 78aa, 28 U.S.C. Section 1331 and 28 U.S.C. 1307.

14.     This Court has personal jurisdiction over defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa.

15.     In connection with the acts alleged herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails and facilities of a national securities exchange. HRB's securities trade on the New York Stock Exchange and are registered pursuant to section 12(b) of the Securities Act of 1933.

4

## PARTIES

16.     Plaintiff Michael Nettie purchased shares of HRB securities during the Class Period, as per the annexed certificate.  Mr. Nettie purchased HRB securities on the New York Stock Exchange and suffered damages.

17.     HRB provides various financial services to the general public, principally in the United States, Canada, Australia, and the United Kingdom. Its tax operations include tax return preparation, and related services and products related to income tax return preparation in the United States. The Company also offers customers various options for receiving their income tax refund, including a check directly from the Internal Revenue Service, an electronic deposit directly to their bank account, and a refund anticipation check.

18.     HRB's investment products and services include traditional brokerage services, as well as annuities, insurance, fee-based accounts, online account access, equity research and focus lists, model portfolios, asset allocation strategies, and other investment tools and information, including the Express IRA program.

19.     In addition, HRB originates mortgage loans, services nonprime loans, and sells and securitizes mortgage loans and residual interests. The loan servicing involves collecting and remitting mortgage loan payments, making required advances, accounting for principal and interest, holding escrow for payment of taxes and insurance, and contacting delinquent borrowers. Further, the Company offers accounting, tax, and consulting services to middle-market companies. These services include wealth management, retirement resources, payroll services, corporate finance, and financial process outsourcing.

20.     HRB was founded in 1946 and is headquartered in Kansas City, Missouri.

5

21.     Defendant Mark A. Ernst is Chairman, President and CEO of the Company.  Mr. Ernst has served as Chairman of the Board of the Company since September 2002, CEO of the Company since January 2001 and as President of the Company since September 1999. He served as Chief Operating Officer of the Company from September 1998 through December 2000 and as Executive Vice President of the Company from September 1998 until September 1999.

22.     By reason of his direct and substantial management position and responsibilities, Mr. Ernst is a "control person" of HRB within the meaning of the federal securities laws, had the power and influence to control HRB, and exercised that control to cause HRB to engage in the violations and improper practices complained of herein.  Mr. Ernst had access to adverse non-public information about HRB's operations, and acted to conceal and misrepresent such material information in violation of his duties and responsibilities under the federal securities laws.

23.     It is appropriate to presume that the false, misleading, and incomplete information conveyed in HRB's press releases, public statements, and other publications as alleged herein are the actions of Mr. Ernst.  Mr. Ernst directly participated in the management of HRB, was directly involved in the day-to-day operations of HRB at the highest levels, and was privy to confidential proprietary information concerning the Company and its operations, as alleged herein.  Mr. Ernst was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, was aware of or recklessly disregarded the fact that false and misleading statements were being issued regarding HRB, and approved or ratified these statements in violation of the federal securities laws.

## BACKGROUND INFORMATION

24.     Since 2002, HRB has emphasized its Express IRA accounts, opening nearly 500,000 accounts.  These accounts only offer one investment option – an FDIC insured money market account that typically pays an interest rate less than the rate of inflation.

6

25. Mr. Ernst was aware of these problems since at least 2002, in particular that the rates paid on the investments were uncompetitive and were consumed by the associated fees. According to Mr. Spitzer's complaint, Mr. Ernst received an e-mail from an HRB district manager detailing problems with the program, and Mr. Ernst forwarded the e-mail to another product manager and stated the Company should consider eliminating "the fees." Mr. Spitzer's complaint annexes exhibits evidencing Defendants' knowledge that the program presented serious problems.

26. Notwithstanding Mr. Ernst's knowledge that the program was suspect, the Company marketed the program to hundreds of thousands of low-income customers. In fact, according to Mr. Spitzer's complaint, the typical customer who opens an Express IRA earns under $30,000 per year and is saving for the first time. Approximately 80 percent of HRB clients who opened an Express IRA funded it through their tax refund.

27. As also detailed below, the Company's earnings improperly have been buttressed through the use of the RALs program and the Company's prospects falsely portrayed in a positive light. Since 2001, Californians reportedly have bought more than 1.5 million RALs from HRB, generating tens of millions of dollars in income for HRB and received a "substantial portion of the loan fees," according to the Mr. Lockyer's complaint, and have purchased up to 49.9 percent of the loans.

28. To illustrate how the HRB RAL program targets low-income families, the complaint notes that recipients of the federal Earned Income Tax Credit (EITC) comprise 70 percent of the Company's customers for RALs and similar products, even though EITC recipients account for just 17 percent of all taxpayers. The federal government established the EITC to benefit low-income workers and their families.

29.     Additionally, HRB's marketing of RALs has been deceptive in a number of ways, according to the complaint. Advertisements have portrayed RALs as a "refund" or "instant money," and falsely told consumers that RAL recipients get "cash, cold, green, in your hand, out the door." In reality, the complaint alleges, the refund is a loan, the cash is a check, and the check is for substantially less than the refund, after the loan fees and other charges are deducted.

30.     Further, according to the complaint, HRB frequently has steered customers to companies that charge fees to cash RAL checks, with HRB getting a kickback on a portion of those fees.

31.     HRB has failed to adequately disclose these arrangements to consumers, the complaint alleges, the result being that the Company has garnered illegal profits via an unsustainable business practice.

## CLASS PERIOD STATEMENTS

32.     This action alleges that defendants engaged in a fraudulent course of business conduct between January 31, 2005 and March 17, 2006, inclusive, the Class Period. During the Class Period, Mr. Ernst and the Company issued myriad false and misleading statements concerning the Company's business practices, internal controls, tax reporting, and compliance with applicable regulations, and omitted material information concerning his and the Company's executives' knowledge that certain highly publicized tax and investment programs violated the law. The effect of the practices was that the Company's common stock traded at artificially inflated levels.

33.     On January 31, 2005, the first day of the Class Period, the Company announced that "HRB Helps Working Americans Build a Stronger Financial Future." Touting its efforts to service lower-income Americans, the Company stated:

8

H&R Block (NYSE:HRB) is reaching out to low- to moderate-income taxpayers with a comprehensive portfolio of products, services and initiatives designed to help families and individuals maximize their tax refunds, keep more of their money and save for the future.

\*\*\*

"We are determined to harness the expertise and knowledge of our company and our tax professionals to help working Americans improve their financial situation," said Bernie Wilson, H&R Block vice president. "This is not only the right thing to do for our company, it's the right thing to do, period. In the months and years ahead, we will continue to help bring working families into the financial mainstream."

\*\*\*

H&R Block's array of low- to moderate-income products and services help clients "get" the maximum refund they deserve, "keep" the money they earn and "save" for their future.

34.    With respect to the Company's Express IRA program:

Save It: Building a Solid Financial Future H&R Block is proving wrong the widely held assumption that lower-income Americans can't save or don't want to save. Over the past four years, the company has helped nearly 400,000 families save almost $210 million for their retirement. One important tool that H&R Block has created to boost saving is the Express IRA. The Express IRA allows clients to open a retirement account with as little as $300. The initial contribution can be funded from the individual's tax refund. After a client has reached $1,000 in savings, the client can roll the Express IRA into a more traditional retirement product. Thus far, about 23,000 account holders have moved their money to retirement vehicles offered by H&R Block Financial Advisors. There are millions of hardworking low-income and moderate-income people in this country who want a safe retirement just as much as wealthier people. With the help of an experienced tax professional, personalized advice and appropriate products, they too can secure their futures.

35.    On February 24, 2005, HRB reported net income of $91.7 million, or 55 cents per diluted share, for the third quarter ended January 31, 2005. Revenues in the third quarter were a reported record $1.03 billion, a 7.2 percent increase over the prior year's quarter.

36.    Commenting on the Company's Investment Services division, in which the

Express IRA business was reported, Mr. Ernst stated:

> Investment Services: Investment services reported third quarter
> revenues of $62.1 million, a 7.5 percent increase over the prior
> year. The pretax loss increased $5.5 million to $18.3 million. For
> the nine-month period, revenues improved 1.2 percent to $169.4
> million, while the pretax loss increased nearly 46 percent to $61.1
> million. "While we are not satisfied with the performance of this
> business, the results are consistent with the view discussed during
> last month's annual investor conference," Ernst said. "We're
> developing a plan to better align this segment's cost structure,
> revenue stream, and strategy for the future. We are seeing strong
> results from our expanded tax professional/financial advisor teams
> designed to increase the delivery of financial services to our tax
> clients," Ernst said.

37.    On March 9, 2005, the Company filed its third quarter report on Form 10-Q for

the period ended January 31, 2005.  The report reiterated the earnings reported in the February

24, 2005 press release.

38.    The quarterly report stated that for the nine months ending January 31, 2005, the

Company had over $295 million assets under management in the Express IRA program.

> For the nine months ended January 31, 2005 compared to January
> 31, 2004, the quarterly report stated that the Company's "[o]ther
> service revenues increased $12.3 million primarily as a result of
> additional revenues associated with POM guarantees and, to a
> lesser extent, increased revenues from RACs and Express IRAs."

> For the three months ended January 31, 2005 compared to January
> 31, 2004 "[o]ther service revenues increased $8.1 million primarily
> as a result of additional revenues associated with Refund
> Anticipation Checks (RACs), Express IRAs and, to a lesser extent,
> increased revenues from POM guarantees."

> With respect to the Company's compliance with regulations
> applicable to the Company's Investment Services Division, the
> quarterly report stated: "Investment Services. Investment Services,
> through HRBFA, is subject to regulatory requirements intended to
> ensure the general financial soundness and liquidity of broker-
> dealers."

39.      On June 8, 2005, the Company reported a 13 percent increase in fourth quarter EPS and fiscal year guidance set at $4.25 to $4.65 per, along with a two-for-one stock split and dividend increase.

40.      The strong earnings were reportedly "driven by revenue growth in each of [the Company's] lines of business. Fourth quarter revenues increased 7.2 percent over the prior year's quarter to $2.4 billion. Revenues for the fiscal year were $4.4 billion, a 4.1 percent increase over the prior year."  Further:

> Consolidated net income for the fourth quarter increased 6.9 percent to $616.5 million. Consolidated net income for the fiscal year declined 10.5 percent to $635 million. Earnings per diluted share for the fourth quarter increased 13 percent to $3.66. For the fiscal year, earnings per diluted share decreased 4.1 percent to $3.76.

41.      Commenting on the results, Mr. Ernst stated:

> We finished our fiscal year on a very high note. . . .  We successfully completed an important transition year in our tax business, saw our mortgage business returning to more normalized levels of profitability, finished a stellar year at RSM McGladrey, and achieved important changes in our investment services organization during the quarter.
>
> For our U.S. tax operations, opening more than 1,200 new retail locations this year was an important first step in positioning us for future client growth as these new locations mature.
>
> Increasing our mortgage sales staff resulted in a 33 percent increase to loan origination volume for the year. At the same time, we are lowering our cost of origination to succeed in a more competitive environment.
>
> For fiscal year 2006, the company said it expects earnings per share in the range of $4.25 to $4.65. Our focus on building our business for the long term is expected to deliver strong financial results in the coming year.

42.      The press release referenced in general terms that the Company would restate some prior results:

Restated Results. The company said that it will restate its results for fiscal years 2004 and 2003, as well as previously reported quarterly results for fiscal 2005, making several changes that it believes collectively will result in an estimated 6-cent increase in earnings per share in fiscal 2004, and an estimated 8-cent decrease in earnings per share in fiscal 2003. The restatement had the effect of adding 14 cents per share to fiscal 2005 results reported prior to the fourth quarter. The decision to restate was based on the cumulative impact of the items.

The company has not completed its analysis of the restatement adjustments, and accordingly, the effects of the restatement are preliminary and subject to change. These adjustments are being reviewed with the company's current and former auditors, and additional detail will be provided later in the company's Form 8-K and 10-K filings.

43.     Mr. Ernst further commented on the Company Investment Services division:

Investment services' fourth quarter revenues increased 12.5 percent to $69.8 million from the prior year's fourth quarter. Fiscal year revenues rose 4.3 percent to $239.2 million. The fourth quarter pretax loss improved 44.6 percent to $12.9 million, compared with the prior year's quarter. For the fiscal year, the pretax loss improved 0.7 percent to $68.1 million. "We've taken a number of actions to dramatically restructure this business, moving to more closely align its costs with its near-term revenue potential," Ernst said. "We've also stepped up our efforts to enhance our advisors' productivity, focusing on programs that will create stronger partnerships with our U.S. tax professionals. Our focus in the upcoming year is on reducing costs as well as attracting and retaining productive advisors," Ernst said. "We'll prudently review all expenditures, measuring them against the segment's performance to achieve a profitable business environment. We expect fiscal 2006 results to show significant improvement."

44.     On July 29, 2005, the Company filed its annual report on Form 10-K. The annual report touted the Express IRA and that they paid competitive interest rates without mention of the draconian fees associated with them.

Individual retirement accounts ("Express IRAs"), invested in FDIC-insured money market accounts, are offered to U.S. clients as a tax-advantaged retirement savings tool. HRBFA acts as custodian on the accounts, with the funds being invested at insured

depository institutions paying competitive money market interest rates.

As previously discussed in "Tax Services," we offer our tax clients the opportunity to open an Express IRA through HRBFA as a part of the tax return preparation process. Clients opened approximately 106,500 Express IRAs during tax season 2005, approximately 145,400 in 2004 and approximately 105,400 in 2003.

45.    The annual report further stated that "service revenues increased $16.0 million, or 12.6%, primarily as a result of additional revenues associated with RALs and Express IRAs."

46.    With respect to the RALs, the annual report stated:

Our Tax Services segment is primarily engaged in providing tax return preparation and related services and products in the United States and its territories, Canada, Australia and the United Kingdom. Revenues include fees earned for services performed at company-owned retail tax offices, royalties from franchise retail tax offices, sales of Peace of Mind ("POM") guarantees, sales of tax preparation and other software, fees from online tax preparation, and participation in refund anticipation loans ("RALs"). Segment revenues constituted 53.4% of our consolidated revenues for fiscal year 2005, 51.6% for 2004, and 52.2% for 2003.

***

RALs are offered to our U.S. clients by a designated bank through a contractual relationship with HSBC Holdings plc ("HSBC"). An eligible, electronic filing client may apply for a RAL at one of our offices. After meeting certain eligibility criteria, clients are offered the opportunity to apply for a loan from HSBC in amounts up to $9,999 based upon their anticipated federal income tax refund. We simultaneously transmit the income tax return information to the IRS and the lending bank. Within a few days or less after the filing date, the client receives a check or direct deposit in the amount of the loan, less the bank's transaction fee, our tax return preparation fee and other fees for client-selected services. Additionally, qualifying electronic filing clients are eligible to receive their RAL proceeds, less applicable fees, in approximately one hour after electronic filing using the Instant Money service. For a RAL to be repaid, the IRS directly deposits the participating client's federal income tax refund into a designated account at the lending bank. See related discussion of RAL participations below.

47.     RALs constitute a material part of the Company's business and revenues:

> Revenues earned during fiscal year 2004 in connection with RAL participations totaled $168.4 million. These revenues are approximately $30.1 million higher than waiver fees earned during fiscal year 2003. See discussion of the waiver below. Our RAL participation revenues benefited from the new company-owned operations in former major franchise territories. We participate in RALs at a rate of nearly 50% for company-owned offices compared to 25% in major franchise offices. This increased participation rate caused our revenues to increase, although the number of RALs declined.

48.     The Company stated in no uncertain terms that the RALs program comports with applicable compliance obligations:

> We also believe that the RAL program is productive for the Company and a useful service for our customers. The RAL program is regularly reviewed both from a business perspective and to ensure compliance with applicable state and federal laws. It is our intention to continue to offer the RAL program in the foreseeable future.

49.     Furthermore, the Company was highly motivated to keep the program viable and generating income - $182 million for the year ended April 30, 2005:

> Loss of the RAL program could adversely affect our operating results. In addition to the loss of revenues and income directly attributable to the RAL program, the inability to offer RALs could indirectly result in the loss of retail tax clients and associated tax preparation revenues, unless we were able to take mitigating actions. Total revenues related to the RAL program (including revenues from participation interests) were $182.6 million for the year ended April 30, 2005, representing 4.1% of consolidated revenues and contributed $101.3 million to the segment's pretax results. Revenues related to the RAL program totaled $174.2 million for the year ended April 30, 2004, representing 4.1% of consolidated revenues.

50.     On September 1, 2005, HRB reported a 26 percent increase in first quarter revenue to $615 million, up from $486.6 million in the prior year and a net loss of $28.3 million

for the first quarter of fiscal 2006 that was 23 percent better than the $36.7 million loss posted the prior year.

51. Commenting on the results, Mr. Ernst stated:

We've started the year with a strong first quarter, highlighted by double-digit revenue increases in all business segments . . . Even with our continuing investment in new tax offices, we saw an improvement over the loss posted last year.

52. With respect to the Investment Services division, the Company reported:

Revenues for Investment Services in the first quarter increased 27 percent to $68 million from $53.6 million in the prior year period. The 2006 first quarter pretax loss of $7.6 million was 63 percent better than the loss of $20.3 million last year. Included in the pretax loss is $9.2 million of intangible amortization.

53. Again, concerning the Investment Services division, Mr. Ernst touted the division:

"The opportunity that we saw for significantly improved performance from Investment Services is beginning to become reality," Ernst said. "While there's still work ahead to achieve better business positioning and performance, we're showing real progress in aligning costs with revenues, raising productivity and forging partnerships with our U.S. tax professionals. We are optimistic that significant performance improvement will continue this year."

54. On November 17, 2005, HRB reported its second quarter financial results for fiscal 2006. The Company reported a net loss of $72.2 million, or 22 cents per share, compared with a loss of $49.9 million, or 15 cents per share, in the year-ago quarter. Revenues in the quarter rose 14 percent to $620.4 million from $542 million in the prior-year period.

55. Commenting on the results, Mr. Ernst stated:

Good performance in our Tax Services, RSM McGladrey and Financial Advisors businesses was offset by weak mortgage earnings. Though mortgage originations and revenues were up during the second quarter, industry pricing pressure and rising funding rates combined to limit mortgage earnings.

56. With respect to the Investment Services division, the Company stated:

Revenues in the quarter increased 30 percent to $70.0 million from $53.8 million in the prior-year period. The pretax loss of $7.9 million in the quarter was 62 percent better than a loss of $20.8 million last year. Included in the quarterly loss in both years is $9.2 million of intangible amortization.

57.     Again, concerning the Investment Services division, Mr. Ernst touted the division:

We were looking for significant performance improvement at Financial Advisors this year, and so far that expectation is being met. There's work to be done to achieve the level of performance we need to sustain this business, but the trend of improvement is clearly encouraging.

58.     On December 12, 2005, HRB announced the revision of its previously reported second quarter results for fiscal 2006. In particular, the Company revised its previously reported quarterly net loss of $72.2 million, or 22 cents per share, to a net loss of $86.3 million, or 26 cents per share. Subsequent to the previously announced second quarter results, the Company conducted an analysis of potential losses associated with Hurricanes Katrina and Rita, and recorded a specific provision for estimated losses. The revision also reflects an increase in state tax expense and change in mortgage servicing rights valuation during the quarter. Moreover, HRB announced that its full-year earnings per share estimate of $1.90 to $2.15 remains unchanged.

**TRUTH BEGINS TO SLOWLY EMERGE CONCERNING**
**THE COMPANY'S IMPROPER PRACTICES**

59.     On February 15, 2006, the California Attorney General, Mr. Lockyer, filed a complaint against HRB (discussed *infra*) alleging that the Company engaged in a conspiracy, common enterprise and common course of conduct, the purpose of which was to commit acts and practices of unfair competition and making untrue or misleading statements with respect to the RALs program, among other practices.

16

60.     HRB issued a press release on this same day denying the allegations of Mr. Lockyer's.  The Company responded as follows:

> [HRB] provides its clients with multiple, prominent disclosures about cross collection before clients commit to a refund anticipation loan or other bank product.  We clearly lead our industry in the quality and quantity of disclosures and financial education provided to clients so that they can make informed decisions in all aspects of tax preparation and refund process.  We believe the Attorney General would better serve California consumers by ensuring that HRB's competitors follow our example.

61.     On February 23, 2006, HRB announced its third quarter results for fiscal 2006. The Company reported that revenues rose 12 percent to $1.2 billion from $1.0 billion in the prior-year period.  Slightly lower revenues in Mortgage Services were offset by higher revenues in all other segments of the Company's operations.  Net earnings were $28.8 million, or 9 cents per diluted share.  For the third quarter of 2005, net earnings were $92.3 million, or 28 cents per share, which included the benefit of $10.1 million after-tax legal recovery representing 3 cents per share.

62.     Concerning the Investment Services division, the Company stated:

> Investment services posted its fourth consecutive quarter of improved year-over-year results.  The pretax loss of $7.7 million in the quarter was 61 percent better than a loss of $19.8 million in the third quarter of fiscal 2005.  Included in the quarterly loss in both years is $9.2 million of intangible amortization.  Revenues in the fiscal 2006 third quarter rose 18 percent to $73.2 million from $62.1 million in the prior-year period.
>
> The improvements were driven by higher production levels, higher net interest revenues due to higher rates and the benefits of cost control.

63.     Mr. Ernst, commenting on the Investment Services division, stated:

> The steady performance improvement at [HRB] Financial Advisors continues to be encouraging.  We have expanded relationships between our financial advisors and tax professionals

to serve more of the financial needs of our clients, and we've been successful in moving clients from Tax Services into Financial Advisor account relationships.

64.     Further, in a bizarre turn of events, the Company reported it was having problems with its own taxes and will restate earnings for fiscal years 2004 and 2005, as well as the first two quarters of fiscal 2006, to correct accounting errors it said led to the Company understating its income tax liability last year by $32 million.

65.     This marked the second time in six months that HRB said it would have to restate past earnings because of accounting problems.

66.     In the latest case, the Company said it plans to reduce fiscal year 2005 earnings by 7 cents per share and reduce fiscal year 2004 earnings by 2 cents. Officials said the mistakes had to do with estimating the Company's state effective income tax rate.

67.     News of this bitterly ironic circumstance caused the Company's common stock to fall $1.86, or 7 percent, to $23.33 in morning trading on the New York Stock Exchange on February 24, 2006. The stock's weakest level of $22.90 on the day was below its previous 52-week low of $23.01.

68.     The Company's troubles continued to leak into the market on March 13, 2006, when it filed a NT 10-Q with the SEC that said it would not file its quarterly report with the SEC on time, blaming the delay on the previously announced restatement of earnings going back to 2004 -- a restatement prompted by the discovery that the Company underpaid its state taxes.

69.     The filing stated that HRB was "continuing the process of analyzing the state income tax expense to determine the final restatement adjustment and the periods to which such adjustments relate," but said "it is unlikely that the process will be complete and audited within a time frame that permits the company's form 10Q for the quarter ended January 31, 2006 to be filed within the prescribed time period."

18

70. Finally, on March 15, 2006, New York State Attorney General, Mr. Spitzer, launched a lawsuit against HRB. The suit, filed in New York State Supreme Court, (discussed *infra*) alleges that the Company's Express IRA product didn't disclose enough information about the expenses associated with it. In short, Mr. Spitzer alleged that the product costs HRB customers more in fees than the interest earned.

71. News of the suit's allegations concerning the Company's improper practices, and that it would no longer be able to pad its earnings with revenues from the Express IRA plans, caused the Company's shares to tumble $2.20, or 10 percent, to $19.80 in morning trading on the New York Stock Exchange. The stock fell below its previous 52-week low of $21.58 set on March 14. By the end of trading on March 15, 2006, the stock closed at $21.41 per share.

72. The above statements concerning the Company's business practices, earnings, and business model were false and misleading, and omitted material information. In particular, the Company's filings and earnings releases falsely touted the virtues of the Company's Express IRA product, while failing to disclose that the product was burdened with excessive fees that literally consumed any returns the accounts generated.

73. The Company's statements also failed to disclose that Mr. Ernst – along with other members of management – knew that the fees were onerous and would incur regulatory scrutiny, and that they were part of an unsustainable business model that, once uncovered, would no longer generate revenues to the degree they had during the period prior to Mr. Spitzer's complaint.

74. Defendants failed to disclose that the Express IRAs were designed to take advantage of lower-income persons by charging inappropriate fees that wrongfully inflated the Company's earnings. The Company further falsely portrayed itself as providing competitive

investment products that would augment the Company's earnings when members of management, including Mr. Ernst, knew they were improper.

75. Moreover, the Company's earnings were inflated during the Class Period because the Company was underpaying its state tax liabilities, thereby necessitating that it restate prior earnings' periods, delay the filing of its quarterly report and conduct a more in depth investigation than initially reported.

76. During the Class Period, the Company earned substantial revenues on the aforementioned RALs or "Refund Anticipation Loans." The RALs are secured by taxpayers' anticipated tax refund and based on the amount one anticipates to receive as a refund. The IRS does not let HRB make the loans directly.

77. Instead, the loans are technically provided by a bank that HRB contracts *via* HRB subsidiaries. This practice has earned HRB substantial revenues. But HRB doesn't disclose to its clients that it earns these revenues – nearly 50 percent of the interest on the loan and a license fee. Defendants further market these loans as the "customer's money" when they are not a refund, but rather a loan that carries an interest obligation and other fees.

78. In this way, the Company has garnered substantial revenues *via* a deceptive trade practice that Mr. Lockyer has called illegal and targeted to exploit lower-income persons eager for their refunds.

79. Defendants have omitted material information concerning the legality of this practice and the known risks associated with doing this type of business. The duty to disclose this is triggered by the Company touting the RALs and reporting that the business is profitable, sustainable and lawful when in fact it is not.

80.     For example, the Company's annual report discusses RALs and states that they are subject to regulatory schemes:

> Federal statutes and regulations also regulate an electronic filer's involvement in RALs. Electronic filers must clearly explain the RAL is a loan and not a substitute for or a quicker way of receiving an income tax refund. Federal laws place restrictions on the fees an electronic filer may charge in connection with RALs. In addition, some states and localities have enacted laws and adopted regulations for RAL facilitators and/or the advertising of RALs.
>
>                                   ***
>
> We believe the federal, state and local laws and legislation regulating electronic filing, RALs and the facilitation of RALs, loan brokers, credit services, credit repair services, insurance products, and proprietary schools have not, and will not in the future, have a material adverse effect on our operations.

81.     Defendants, however, omitted from this information that the Company's RALs practice was facilitated through false and misleading advertising directed to lower income persons, and that it ran afoul of several states' laws, including California. Accordingly, any revenues garnered under this plan were subject to potential forfeiture and penalty. Moreover, it was false for Defendants to portray the RALs as a component of a proper business model that would generate revenues going forward.

82.     Finally, Defendants at least recklessly filed inaccurate results with the SEC. In particular, the Company's 2004 and 2005 earnings understated state taxes by $10 million and $22 million respectively. Further, the Company stated "the review is continuing" and "everything is still preliminary."

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who, during the Class Period purchased HRB securities on the New York Stock Exchange (the "Class"). Excluded

21

from the Class are the defendants, all of the officers, directors, employees and partners thereof, members of their immediate families and their legal representatives, heirs, predecessors, successors and assigns and any entity in which any of the foregoing has a controlling interest.

84.     The members of the Class are so numerous that joinder of all members is impracticable. As of November 30, 2005, the Company had more than 327 million shares of its stock outstanding. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe there are, at a minimum, thousands of members of the Class located throughout the United States. Throughout the Class Period, HRB securities were actively traded on the New York Stock Exchange.

85.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.      Whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the financial condition of HRB;

c.      Whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

d.      Whether the market prices of the Company's stock and options were artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

e.     Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

86.     Plaintiff's claims are typical of the claims of the members of the Class as they and members of the Class sustained damages arising out of the defendants' wrongful conduct in violation of federal securities laws as complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

89.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     defendants made false and misleading statements of material fact, and failed to disclose material facts, during the Class Period;

b.     the misstatements and omissions were material;

c.     the securities and options of the Company traded in efficient and open markets (excluding the effects of fraud): the Company was followed by numerous major

23

analysts; the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE; and

d.    the misstatements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities.

90.    Plaintiff and members of the Class purchased their HRB securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

91.    Based upon the foregoing, Plaintiff and other members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's securities.

## COUNT I
### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Of The Securities And Exchange Commission As Against Defendants HRB and Ernst

92.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93.    This Count is asserted against defendants HRB and Mr. Ernst and is based upon section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder.

94.    During the Class Period, defendants HRB and Mr. Ernst directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and

24

unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase HRB securities during the Class Period at artificially inflated prices.

95.     During the Class Period, defendants HRB and Mr. Ernst, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued and participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

96.     As a result of the dissemination of the false and misleading statements set forth above, the market price of HRB securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the statements described above, and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing HRB securities. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares, or would not have purchased them at the inflated prices that were paid.

97.     Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

98.     By reason of the foregoing, defendants HRB and Mr. Ernst directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other

members of the Class in connection with their purchases of HRB securities during the Class Period.

**COUNT II**
**For Violation Of Section 20(a) Of The Exchange Act**
**As Against Defendant Ernst**

99.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.    Mr. Ernst acted as controlling person of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's products, sales, accounting, plans and implementation thereof, he had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  Mr. Ernst was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements, or cause the statements to be corrected.

101.    In particular, Mr. Ernst had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had and exercised the power to control or influence the particular statements giving rise to the securities violations as alleged herein.

102.    By virtue of his position as a controlling person, Mr. Ernst is liable pursuant to section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct,

plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiff and the other members of the Class against the Defendants for the damages sustained as a result of the wrongdoings of the Defendants, together with interest thereon;

C.    Awarding plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys, and experts;

D.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that plaintiff has an effective remedy; and

E.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:      March 17, 2006

**SPEER LAW FIRM, P.A.**


By:   /s/ Charles F. Speer_____
Charles F. Speer # 40713
104 W. 9th Street, Suite 305
Kansas City, MO 64105
(816) 472-3560
(816) 421-2150 (fax)

**WOLF HALDENSTEIN ADLER**
     **FREEMAN & HERZ LLP**
Gregory Mark Nespole
Paulette S. Fox
Iona Evans
270 Madison Avenue
New York, New York 10016
(212) 545-4600

**LAW OFFICES OF BRUCE G. MURPHY**
Bruce G. Murphy, Esq.
265 Llwyds Lane
Vero Beach, FL 32963
(561) 231-4202